UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION

ISHMAEL GOUGH,                                                                    Plaintiff,

v.                                                    Civil Action No. 3:12-cv-849-DJH-CHL

LOUISVILLE JEFFERSON COUNTY
METRO GOVERNMENT and
CHAUNCEY CARTHAN,                                                              Defendants.

* * * * *

**<u>MEMORANDUM OPINION AND ORDER</u>**

Plaintiff Ishmael Gough was shot by Defendant Chauncey Carthan, an intoxicated off-duty police officer, after Carthan pursued Gough for speeding. Gough sued Carthan and Carthan's employer, Louisville Jefferson County Metro Government. (Docket No. 1) Carthan asserts immunity, arguing that his actions were reasonable. (D.N. 70) Louisville Metro contends that it is not liable for failing to adequately train or supervise Carthan. (D.N. 72) The Court heard oral argument on the defendants' motions for summary judgment on April 13, 2017. For the reasons explained below, Carthan's motion will be granted in part and denied in part, and Louisville Metro's motion will be granted.

I.      **BACKGROUND**

This case arises out of an encounter between Gough and Carthan, who was then a Louisville Metro Police Department detective, on September 4, 2012. Some facts are undisputed, but the parties disagree on a few key points, at least one of which is material.

At approximately 11:00 p.m. on September 4, 2012, Carthan was driving on West Madison Street in Louisville after drinking a pint of brandy with a friend. (D.N. 70-2, PageID # 371-72) He was in an LMPD "pool car," an unmarked black Ford Mustang that had no police

1

equipment.  (*Id.*, PageID # 371)  Carthan began following Gough's car after noticing that Gough was speeding.  (*Id.*, PageID # 372)

According to Carthan, Gough stopped in the middle of the street, exited his car, and approached Carthan's car.  (*Id.*, PageID # 372-73)  Carthan then got out of the Mustang, displayed his badge, announced that he was a police officer, and told Gough to get back in his vehicle.  (*Id.*, PageID # 373-74)  Carthan was holding a gun.  (*Id.*, PageID # 374)  When Gough continued to approach, Carthan pointed the gun at Gough and "instructed him to get down on the ground."  (*Id.*)  Gough initially complied, but as Carthan went to handcuff him, he "came up off the ground and . . . started swinging at [Carthan], . . . trying to grab [Carthan's] weapon."[1]  (*Id.*, PageID # 375; *see id.*, PageID # 374)  Carthan again instructed Gough to get on the ground, and Gough again complied.  (*Id.*, PageID # 375)  Meanwhile, Carthan recalls, he was "trying to create this distance between [himself] and [Gough]" to prevent Gough from "grab[bing his] weapon" or "strik[ing]" him.  (*Id.*)  As Carthan approached a second time to handcuff Gough, Gough "came up and did the exact same thing he did the first time[:] started trying to fight with [Carthan]" and take the gun.  (*Id.*, PageID # 377; *see id.*, PageID # 376)  Carthan "continued to create distance" between them, but Gough "kept coming toward" him, and Carthan fired one round, striking Gough in the leg.  Carthan's estimates of the distance between him and Gough at the time of the shooting have varied.  Although he testified on several occasions that the distance was five to seven yards (i.e., between fifteen and twenty-one feet), he stated at his deposition that he and Gough were five to seven feet apart.  (*Id.*, PageID # 377)

In Gough's recollection, he stopped to see why he was being followed, and Carthan "came up to [Gough's] car with his gun drawn and told [Gough] to get out, that he was a police

---

[1] It is unclear why handcuffs were necessary, as Carthan testified that he had not placed Gough under arrest.  (D.N. 70-2, PageID # 375-76)

officer." (D.N. 70-3, PageID # 382)  When Gough got out of his vehicle, Carthan told him to lie

down on the ground, and he complied.  (*Id.*, PageID # 383)  Gough asked repeatedly what he had

done wrong, but Carthan did not respond.  (*Id.*)  Gough saw no indication that Carthan, who was

wearing a t-shirt, sweat shorts, and sandals, was in fact a police officer.  (*Id.*; *see* D.N. 70-2,

PageID # 370)  After about a minute, Gough began to think he was being robbed, so he "got up

off the ground" and "tried to reach for [Carthan's] gun."[2]  (D.N. 70-3, PageID # 383)

> Gough testified that just before he was shot,
>
> I had like touched [Carthan's] hand, his arm and he had kind of cocked back so I
> couldn't grab it.  So when he cocked his back [sic], I just had my hands up away
> from my body and everything and telling him not to shoot me.
> . . . .
> After like a couple of steps back towards like to my car, my door was still open so
> I just had my hands up towards my car telling him not to shoot me and he shot me
> in my leg.

(*Id.*, PageID # 384)  Carthan never told Gough he was under arrest or what he had done wrong,

nor did he call for EMS after shooting Gough.  (*Id.*)  Lying on the ground, Gough got the

attention of a bystander; the bystander called police.  (*Id.*)

When police arrived, they did not initially recognize Carthan as an officer.  (*Id.*)  Gough

did not learn that Carthan was actually a police officer until he was interviewed by LMPD at the

hospital later that night.  (*Id.*; *see* D.N. 87-1, PIU 00043-44)  A breathalyzer test administered to

Carthan three and a half hours after the incident revealed an alcohol level of 0.081—above the

legal limit.  (D.N. 87-2, PageID # 730)  He was placed on administrative leave as a result of the

shooting.  Following investigations by the LMPD Public Integrity Unit and Professional

Standards Unit, Carthan was given the option of resigning or being terminated.  (*Id.*, PageID #

---

[2] Gough testified that he reached for the gun "[n]ot with intentions of trying to hurt [Carthan] but
intentions to try to get this gun so he wouldn't hurt me."  (D.N. 70-3, PageID # 383)

738)  He opted to resign and was ultimately charged with and convicted of driving under the influence.

Gough alleges that Carthan's actions constituted excessive force and unreasonable search and seizure under the Fourth and Fourteenth Amendments, as well as assault, battery, outrageous conduct, and intentional infliction of emotional distress under state law.  (D.N. 1, PageID # 5-6) He seeks to hold Louisville Metro liable for negligent hiring, training, and supervision.  (*Id.*, PageID # 6-7)  The defendants have moved for summary judgment on all of Gough's claims. (D.N. 70, 72)

## II.    ANALYSIS

### A.    Carthan

Carthan asserts qualified immunity on Gough's § 1983 claims and qualified official immunity as to the state-law claims.  (*See* D.N. 70-1, PageID # 353, 362)  Qualified immunity "protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"  *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  To determine whether qualified immunity applies, the Court engages in a two-step inquiry, asking whether the plaintiff has presented facts demonstrating a violation of a constitutional right and "whether the right at issue was 'clearly established' at the time of [the] defendant's alleged misconduct."  *Id.* at 232 (quoting *Saucier v. Katz*, 533 U.S. 194, 201 (2001)).  Carthan's claim of immunity fails this test.

#### 1.    Unreasonable Search and Seizure

Gough first asserts that the "initial stop" was unlawful because Carthan lacked reasonable suspicion.  (D.N. 87, PageID # 524; *see id.*, PageID # 525-26)  However, under either side's

version of the facts, Carthan did not "stop" Gough: Gough testified that he pulled over on his own to see why he was being followed, with no inkling that the driver of the black Mustang was a police officer (D.N. 70-3, PageID # 382, 385); Carthan said he was merely following Gough's car to get the license-plate number when Gough suddenly stopped in the middle of the street. (D.N. 70-2, PageID # 372-73) "It is only when an officer restrains an individual's liberty 'by means of physical force or show of authority' that Fourth Amendment protections attach." *Bennett v. City of Eastpointe*, 410 F.3d 810, 821 (6th Cir. 2005) (quoting *Terry v. Ohio*, 392 U.S. 1, 19 n.16 (1968)). "A person's liberty is restrained if a reasonable person in the circumstances would not believe that she were free to leave and ignore the officer's requests." *Id.* (citing *United States v. Mendenhall*, 446 U.S. 544, 554 (1980)). The Court's Fourth Amendment analysis therefore begins after the cars were stopped, when Carthan identified himself as a police officer and ordered Gough to the ground at gunpoint.

Carthan argues that his actions were reasonable to ensure his safety. (*See* D.N. 70, PageID # 355; D.N. 91, PageID # 881) He asserts that he "was justifiably concerned for his safety" because "Gough's erratic driving, and the area of town that he was in, further combined with Gough's decision to stop his vehicle, signaled danger." (D.N. 91, PageID # 881) For purposes of the qualified-immunity inquiry, however, the Court must view the facts in the light most favorable to Gough. *See Bouggess v. Mattingly*, 482 F.3d 886, 896 (6th Cir. 2007). Gough denied that he was driving erratically, and he testified that he pulled over, not that he "stopped his vehicle in the middle of the street," as Carthan represents. (D.N. 70-1, PageID # 355; *see* D.N. 70-3, PageID # 385) Gough also testified that after pulling over, he remained in his car. (D.N. 70-3, PageID # 382) According to Gough, Carthan approached "with his gun drawn and told [Gough] to get out, that he was a police officer," and once Gough was out of the car,

Carthan ordered him to the ground.  (*Id.*)  Under these facts, the only suspicious activity Carthan

had witnessed at the time he detained Gough was that Gough was driving "a little over the speed

limit" in a neighborhood with a high crime rate.  (*Id.*, PageID # 385; D.N. 87, PageID # 526)

Gough has admitted that he was speeding and that Carthan thus would have had a lawful

reason to stop him.  (D.N. 70-3, PageID # 385)  But it is clearly established in the Sixth Circuit

that

> probable cause to detain a motorist for one violation of the law does not ordinarily
> provide probable cause to detain the motorist for another violation.  Thus, "[o]nce
> a stop begins, . . . detaining the motorist any longer than is reasonably
> necessary to issue the traffic citation requires reasonable suspicion that the individual has
> engaged in more extensive criminal conduct."

*Green v. Throckmorton*, 681 F.3d 853, 860 (6th Cir. 2012) (alteration and omission in original)

(quoting *United States v. Smith*, 601 F.3d 350, 542 (6th Cir. 2010)); *see also United States v.*

*Urrieta*, 520 F.3d 569, 578 (6th Cir. 2008) (explaining that "a motorist cannot be further

detained" beyond the purpose of the traffic stop "unless something that occurred during the stop

caused the officer to have a reasonable and articulable suspicion that criminal activity was afoot"

(quoting *United States v. Hill*, 195 F.3d 258, 264 (6th Cir. 1999))).  "[E]ven the briefest of

detentions" violates the Fourth Amendment if reasonable suspicion is lacking.  *Urrieta*, 520 F.3d

at 578.

"The Fourth Amendment prohibits detention based on an 'inchoate and unparticularized

suspicion or hunch,' and instead requires law enforcement to provide 'specific and articulable

facts' showing that a crime has occurred."  *Id.* (quoting *Terry*, 392 U.S. at 21, 27, 30).  In other

words, a detention may not be "based on an officer's 'gut feeling' that a suspect is up to no

good."  *Id.* (citing *Terry*, 392 U.S. 21, 27, 30).  The Court may take into account that the plaintiff

was in a high crime area, but "[a]n individual's presence in an area of expected criminal activity,

standing alone, is not enough to support a reasonable, particularized suspicion that the person is committing a crime." *United States v. Bridges*, 626 F. App'x 620, 624 (6th Cir. 2015) (citing *Illinois v. Wardlaw*, 528 U.S. 119, 124 (2000)).

The evidence in this case does not show that Carthan's actions were supported by reasonable suspicion. Although a police officer may require a motorist to exit his vehicle during a traffic stop in the interest of officer safety, *Pennsylvania v. Mimms*, 434 U.S. 106, 111 n.6 (1977), nothing had occurred to warrant further action by Carthan. At the time he told Gough to get on the ground, Carthan had reasonable suspicion only that Gough had committed a traffic offense. This was not enough to justify ordering Gough to the ground and attempting to handcuff him. *Cf. Dorsey v. Barber*, 517 F.3d 389, 400 (6th Cir. 2008) (finding defendant police officer's actions "at least arguably unreasonable"; because suspects for whom plaintiffs were mistaken "were wanted in connection with an auto theft investigation" and plaintiffs "did not manifestly pose an immediate threat to anyone's safety or risk of flight," the officer "should have been able to 'stop and hold' them without brandishing his firearm and ordering them to lie face-down on the pavement"). In sum, Gough has presented facts demonstrating the Carthan violated a clearly established Fourth Amendment right by detaining him. *See Urrieta*, 520 F.3d at 574.

### 2. Excessive Force

A constitutional violation also occurs when police "use 'unreasonable' or 'excessive' force in seizing a person." *Ortiz v. Kazimer*, 811 F.3d 848, 851 (6th Cir. 2016) (quoting *Graham v. Connor*, 490 U.S. 386, 394-95 (1989)). When analyzing an excessive-force claim, the Court must consider whether an officer's actions were reasonable given the "totality of the circumstances," viewing the situation "from the perspective 'of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.'" *Plumhoff v. Rickard*, 134 S. Ct. 2012, 2020

(2014) (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)). "An officer's prior errors in judgment do not make a shooting unreasonable as long as the officer acted reasonably during the shooting itself and the few moments directly preceding it."[3] *Bouggess*, 482 F.3d at 889 (citing *Dickerson v. McClellan*, 101 F.3d 1151, 1161 (6th Cir. 1996)). Thus, the Court must determine whether, when he used deadly force, "the officer ha[d] probable cause to believe that the suspect pose[d] a threat of serious physical harm, either to the officer or to others." *Id.* (quoting *Tennessee v. Garner*, 471 U.S. 1, 11 (1985)). In making this determination, the Court considers "(1) the severity of the crime at issue; (2) whether the suspect poses an immediate threat to the safety of the officers or others; and (3) whether the suspect is actively resisting arrest or attempting to evade arrest by flight." *Id.* (citing *Sigley v. City of Parma Heights*, 437 F.3d 527, 534 (6th Cir. 2006)).

The crime at issue in this case was not severe: by Gough's telling, he was merely driving "a little over the speed limit." (D.N. 70-3, PageID # 385) More importantly, under Gough's version of the facts, he was surrendering when he was shot. (*Id.*, PageID # 384) It is clearly established in the Sixth Circuit that "the gratuitous use of force against a suspect who has 'surrendered' is 'excessive as a matter of law.'" *Ortiz*, 811 F.3d at 852 (quoting *Baker v. City of Hamilton*, 471 F.3d 601, 607 (6th Cir. 2006)). This is true "even when the suspect had originally resisted," as Gough did here. *Id.* (citing *Baker*, 471 F.3d at 603, 608). Likewise, the use of deadly force when a suspect is fleeing violates clearly established constitutional rights, even following a struggle. *See Foster v. Patrick*, 806 F.3d 883, 887-89 (6th Cir. 2015); *Bouggess*, 482

---

[3] Citing this rule, Carthan maintains that it is irrelevant whether he was intoxicated when he shot Gough. (*See* D.N. 70-1, PageID # 352; D.N. 91, PageID # 885-86) However, the Sixth Circuit has indicated that an officer's intoxication may be relevant in an excessive-force case. *See McDonald v. Flake*, 814 F.3d 804, 814-15 (6th Cir. 2016). And ignoring Carthan's drunken state would be inconsistent with the Supreme Court's instruction to consider the "totality of the circumstances." *Plumhoff*, 134 S. Ct. at 2020.

F.3d at 895.  What matters is whether the suspect presented a serious threat to the officer's safety at "the moment immediately preceding the shooting." *Bouggess*, 482 F.3d at 890 (citing *Dickerson*, 101 F.3d at 1162).

Here, although it is undisputed that Gough attempted to disarm Carthan, the parties disagree as to the sequence of events immediately preceding the shooting: In Carthan's version, Gough was "coming toward" him, trying to take his gun for the second time (D.N. 70-2, PageID # 377); Gough maintains that he was retreating to his car with his hands up, telling Carthan not to shoot.  (D.N. 70-3, PageID # 384)  This disagreement precludes summary judgment in favor of Carthan.  Viewing the facts in the light most favorable to Gough, the Court must assume that the shooting occurred as Gough was stepping away from Carthan, at a distance of fifteen to twenty-one feet, indicating surrender both physically and verbally.  (*See id.*; D.N. 70-2, PageID # 377)  In other words, at that moment, Gough did not "pose[] an imminent threat of serious physical harm" to Carthan or others, his earlier attempts to disarm Carthan notwithstanding. *Bouggess*, 482 F.3d at 890.  The use of deadly force under these circumstances violates a clearly established constitutional right.  *See Ortiz*, 811 F.3d at 852; *Dickerson*, 101 F.3d at 1163.  Even Carthan's expert witness, Michael Lyman, concedes that if Gough was "standing by his car with his hands in the air surrendering," as he claims, then Carthan's actions constituted "an inappropriate shoot without justification."  (D.N. 87-3, PageID # 838; *see also id.*, PageID # 832 (acknowledging that Carthan and Gough gave differing accounts of the events leading up to the shooting and that his opinion was based on Carthan's version))  In sum, Carthan is not entitled to summary judgment on the basis of qualified immunity.

### 3. State-Created Danger

Gough also asserts that Carthan is liable under the Fourteenth Amendment on a theory of state-created danger. (D.N. 87, PageID # 534-36) That theory "imposes liability on the government when it 'exposes an individual to private acts of violence by either creating danger or causing an individual to be more vulnerable to danger.'" *Estate of Barnwell v. Grigsby*, No. 16-6027, 2017 U.S. App. LEXIS 3905, at *17-*18 (6th Cir. Mar. 3, 2017) (quoting *Willis v. Charter Twp. of Emmett*, 360 F. App'x 596, 600-01 (6th Cir. 2010)). A plaintiff who alleges state-created danger must show

> (1) affirmative acts by the state that "create or increase the risk that an individual will be exposed to private acts of violence[";] (2) that the state's actions placed the victim "specifically at risk, as distinguished from a risk that affects the public at large[";] and (3) that the state knew or "clearly should have known that its actions specifically endangered an individual."

*Peete v. Metro. Gov't of Nashville & Davidson Cty.*, 486 F.3d 217, 223 (6th Cir. 2007) (quoting *Kallstrom v. City of Columbus*, 136 F.3d 1055, 1066 (6th Cir. 1998)). "[T]o prevail on a claim under this doctrine, a plaintiff must show [that] a governmental actor put the plaintiff at risk for an injury committed by a *private person*." *Estate of Barnwell*, 2017 U.S. App. LEXIS 3905, at *18 (emphasis added) (citations omitted). The state-created danger doctrine is inapplicable where the individual in question "suffered harm at the hands of government defendants," i.e., defendants who are "*not* private actors." *Id.* (citing *Peete*, 486 F.3d at 223). It thus does not apply here, where Gough's injury was caused by a police officer. *See id.*; *see also Dickerson*, 101 F.3d at 1162 ("[A]ll claims that law enforcement officers have used excessive force—deadly or not—in the course of an arrest, investigatory stop, or other seizure of a free citizen should be analyzed under the Fourth Amendment and its reasonableness standard." (quoting *Graham*, 490

U.S. at 395)).  Summary judgment is therefore appropriate to the extent Gough asserts a claim under the Fourteenth Amendment.

### 4. State-Law Claims

Carthan asserts qualified official immunity with respect to Gough's state-law claims. (D.N. 70-1, PageID # 362-63)  Qualified official immunity "affords protection from damages liability for good faith judgment calls made in a legally uncertain environment." *Bouggess*, 482 F.3d at 897 (quoting *Yanero v. Smith*, 65 S.W.3d 510, 522 (Ky. 2001)).

> [A] finding of "bad faith can be predicated on a violation of a constitutional, statutory, or other clearly established right which a person in the public employee's position presumptively would have known . . . i.e., objective unreasonableness; or if the officer or employee willfully or maliciously intended to harm the plaintiff or acted with a corrupt motive."

*Id.* (quoting *Yanero*, 65 S.W.3d at 523).  Thus, because the facts, taken in the light most favorable to Gough, establish a constitutional violation, Carthan is not immune under state law. *Cf. id.*

Gough's claim of outrage, or intentional infliction of emotional distress, will nevertheless be dismissed.[4]  (*See* D.N. 1, PageID # 6)  To prevail on a claim of intentional infliction of emotional distress, a plaintiff must establish that (1) "[t]he wrongdoer's conduct [was] intentional or reckless"; (2) "the conduct [was] outrageous and intolerable in that it offends against the generally accepted standards of decency and morality"; (3) "there [was] a causal connection between the wrongdoer's conduct and the emotional distress"; and (4) "the distress suffered [was] severe." *Osborne v. Payne*, 31 S.W.3d 911, 913-14 (Ky. 2000).  While the first three elements are arguably met here, Gough has presented no evidence that he suffered severe

---

[4] Gough may have abandoned this claim, as he did not address it in his response to the defendants' motions.

emotional distress as a result of Carthan's actions.  Summary judgment is therefore warranted with respect to this claim.

Gough's negligence claim is likewise unsupported.  Gough asserts that Carthan owed him a duty of care because "[a]t a fundamental level, 'every person owes a duty of care to every other person to exercise ordinary care in his activities to prevent foreseeable injury,'" and it was foreseeable that Carthan's drunkenness could lead to harm.  (D.N. 87, PageID # 537 (quoting *James v. Wilson*, 95 S.W.3d 875, 891 (Ky. Ct. App. 2002)))  The universal duty of care, however, is inapplicable to public officials.  *City of Florence v. Chipman*, 38 S.W.3d 387, 393 (Ky. 2001).  A police officer does not owe a duty to a plaintiff unless there is a "special relationship" between them.  *Id.* at 392.

> In order for the special relationship to exist, two conditions are required: 1) the victim must have been in state custody or otherwise restrained by the state at the time the injury[-]producing act occurred, and 2) the violence or other offensive conduct must have been committed by a state actor.

*Id.* (citing *Fryman v. Harrison*, 896 S.W.2d 908 (Ky. 1995); *Ashby v. City of Louisville*, 841 S.W.2d 184 (Ky. Ct. App. 1992)).  Under Gough's version of the facts, he was not in custody or restrained when he was shot.  (*See* D.N. 70-3, PageID # 384)  Because Carthan did not owe Gough a duty of care, Gough's negligence claim is subject to summary judgment.

### B.     Louisville Metro

Although Gough's complaint alleges separate claims of failure to adequately hire, train, or supervise (Count Three) and negligent hiring (Count Four), his response addresses the claims against Louisville Metro collectively.  (*See* D.N. 87, PageID # 541-47)  He argues that "there is sufficient proof in the record of material factual disputes with respect to two avenues of § 1983 municipal liability: [1] a failure to train and adopt policies necessary to prevent the deprivation

of [Gough's] constitutional rights and [2] the actions of final policymakers of the City." (*Id.*, PageID # 541-42)

The latter theory, under which Gough asserts that Carthan was a policymaker whose decisions give rise to municipal liability (*see id.*, PageID # 545), can be disposed of summarily. Gough acknowledges in his response brief that a public official is a "final policymaker" only if the official's "decisions are final and unreviewable and are not constrained by the official policies of superior officials." *Adair v. Charter Cty. of Wayne*, 452 F.3d 482, 493 (6th Cir. 2006) (quoting *Waters v. City of Morristown*, 242 F.3d 353, 362 (6th Cir. 2001)). (*See* D.N. 87, PageID # 545) As Louisville Metro observes, this definition does not include Carthan because his actions were subject to review: the incident involving Gough was investigated by LMPD's Professional Standards Unit and Public Integrity Unit, which resulted in criminal charges against Carthan and ultimately his resignation. (*See* D.N. 87-2, PageID # 738) Nevertheless, Gough's counsel insisted during oral argument that any post-hoc review is irrelevant because the shooting could not be undone.

Under Gough's interpretation, virtually every action by an individual police officer would amount to an official municipal policy giving rise to municipal liability. But "not every decision by municipal officers automatically subjects the municipality to § 1983 liability." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 481 (1986). Rather, "[m]unicipal liability attaches only where the decisionmaker possesses final authority to establish municipal policy with respect to the action ordered." *Id.* The Supreme Court has explained that

> [w]hen an official's discretionary decisions are constrained by policies not of that official's making, those policies, rather than the subordinate's departures from them, are the act of the municipality. Similarly, when a subordinate's decision is subject to review by the municipality's authorized policymakers, they have retained the authority to measure the official's conduct for conformance with their policies.

*St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988) (citing *Pembaur*, 475 U.S. at 481-84). Thus, mere authority to make decisions—even consequential ones—does not render a person a final policymaker. *See Miller v. Calhoun Cty.*, 408 F.3d 803, 814 (6th Cir. 2005) (finding that plaintiff incorrectly "conflate[d] decisionmaking with policymaking" in arguing that county was liable for inmate's death because shift commander made decisions concerning emergency medical care). Here, because Carthan's conduct was governed by Louisville Metro policies and subject to review, Carthan was not a final policymaker for municipal-liability purposes.

This leaves Gough's argument that Louisville Metro failed to implement "policies necessary to prevent the deprivation of [his] constitutional rights." (D.N. 87, PageID # 542) As evidence of this alleged failure, Gough points to Carthan's admission (and Louisville Metro's acknowledgment) that at one time, he was allowed—even required—to consume alcohol while on duty. (*Id.*, PageID # 543) Carthan testified at his deposition that when he was working undercover at strip clubs, he had to drink alcoholic beverages to avoid being identified as a police officer. (D.N. 87-2, PageID # 703-04) Louisville Metro admits that this occurred but notes that Carthan has not served in that capacity since 2009 and that Carthan was aware of LMPD's "zero tolerance policy regarding alcohol and driving an LMPD vehicle."[5] (D.N. 90, PageID # 868; *see id.*, PageID # 867)

Generally, to establish liability based on "a municipal custom of 'inaction,'" a plaintiff must show

---

[5] Notwithstanding this policy, Carthan testified that on "at least three to four occasions," LMPD allowed him to drive home intoxicated after such assignments. (D.N. 87-2, PageID # 739) Although the drunk-driving aspect of Carthan's conduct was egregious, the Court finds it largely irrelevant here, as Gough's injury did not arise out of Carthan's operation of a vehicle while intoxicated, but rather his use of force while under the influence.

(1) "a clear and persistent" pattern of unconstitutional conduct by municipal employees; (2) the municipality's "notice or constructive notice" of the unconstitutional conduct; (3) the municipality's "tacit approval of the unconstitutional conduct, such that [its] deliberate indifference in [its] failure to act can be said to amount to an official policy of inaction"; and (4) that the policy of inaction was the "moving force" of the constitutional deprivation, such that the plaintiff's constitutional injury was directly caused by the conduct of the municipality rather than simply by the conduct of the municipal employee.

*D'Ambrosio v. Marino*, 747 F.3d 378, 387-88 (6th Cir. 2014) (alterations in original) (quoting

*Doe v. Claiborne Cty.*, 103 F.3d 495, 508 (6th Cir. 1996)).  Because he cannot point to a pattern

of incidents involving intoxicated LMPD officers, Gough relies on an exception to this rule set

out in *City of Canton v. Harris*, 489 U.S. 378, 390 (1989).  (*See* D.N. 87, PageID # 542)  As

explained in *Canton*,

it may happen that in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need.  In that event, the failure to provide proper training may fairly be said to represent a policy for which the city is responsible, and for which the city may be held liable if it actually causes injury.

*Id.* at 390.  The *Canton* Court hypothesized a scenario in which this exception could apply:

[C]ity policymakers know to a moral certainty that their police officers will be required to arrest fleeing felons.  The city has armed its officers with firearms, in part to allow them to accomplish this task.  Thus, the need to train officers in the constitutional limitations on the use of deadly force can be said to be "so obvious[]" that failure to do so could properly be characterized as "deliberate indifference" to constitutional rights.

*Id.* n.10 (internal citation omitted).

The Supreme Court expanded on the possible application of such "single-incident

liability" in *Connick v. Thompson*, 563 U.S. 51 (2011):

Armed police must sometimes make split-second decisions with life-or-death consequences.  There is no reason to assume that police academy applicants are familiar with the constitutional constraints on the use of deadly force.  And, in the absence of training, there is no way for novice officers to obtain the legal

> knowledge they require.  Under those circumstances there is an obvious need for
> some form of training.

*Id.* at 64.  The Court distinguished the situation at issue in *Connick*, where the plaintiff alleged a

failure to train prosecutors on *Brady* obligations, noting the extensive legal training and

continuing education lawyers are required to undergo.  *See id.* at 64-65.

  *Canton*, *Connick*, and the other cases cited by Gough make clear that single-incident

liability would apply where a municipality failed to train officers for a perilous situation they

were likely to encounter while on duty and unlikely to know how to address in the absence of

specific training.  For example, *Conn v. City of Reno*, 572 F.3d 1047 (9th Cir. 2009), *rev'd*, 658

F.3d 897 (9th Cir. 2011), and *Rhyne v. Henderson County*, 973 F.2d 386 (5th Cir. 1992),

involved allegations of failure to adequately train police officers and jail staff on handling

suicidal inmates.[6]  (*See* D.N. 87, PageID # 542)  Here, although there is evidence that LMPD

allowed Carthan to drink while performing police duties on certain specific assignments,

Gough's injuries are entirely unrelated to that practice, which ended several years earlier.  And

Carthan testified that LMPD policy did not allow him to act while under the influence of alcohol.

(D.N. 87-2, PageID # 728)  Indeed, Gough's entire argument is premised on the assumption that

Carthan's actions were so glaringly inappropriate that anyone would know they were wrong.

(*See, e.g.*, D.N. 87, PageID # 523 ("At the outset, Carthan's state of extreme intoxication makes

---

[6] *Conn*, *Rhyne*, and a third case cited by Gough, *Amerson v. Waterford Township*, 562 F. App'x
484 (6th Cir. 2014), do little to bolster his argument; in none of those cases did the plaintiff
ultimately prevail.  *See Amerson*, 562 F. App'x at 492 (concluding that plaintiff failed to
establish deliberate indifference supporting claim of failure to supervise); *Conn v. City of Reno*,
658 F.3d 897, 897 (9th Cir. 2011) (vacating court's earlier decision regarding failure to train and
failure to adopt and implement adequate policies on suicide prevention); *Rhyne*, 973 F.2d at 393-
94 (finding insufficient evidence to support claims that county adopted inadequate policies
regarding suicidal inmates and failed to adequately train jail staff).  In other words, Gough has
identified no precedent in which application of the "single-incident" exception was found to be
appropriate.

his seizure of anyone, especially through means of deadly force, presumptively unreasonable.")) In short, single-incident liability is inapplicable here because there is no evidence that without training, LMPD officers would not know that they shouldn't use deadly force while intoxicated. *See Connick*, 563 U.S. at 64.

Moreover, Gough's contention that LMPD negligently supervised Carthan because it knew of—and thus must have condoned—his alcohol consumption is unpersuasive. Gough points to Carthan's testimony regarding "Club Chauncey," a nickname given to his house by fellow officers who would come over to "hang out" when they were off duty. (D.N. 87-2, PageID # 703) Carthan testified that his superiors occasionally dropped by but did not socialize. (*See id.*) Contrary to Gough's suggestion, knowledge that Carthan drank while off duty does not amount to knowledge that he was likely to exercise his police powers and shoot someone while drunk. (*See* D.N. 87, PageID # 544) The only case Gough cites in support of this argument, *McDonald v. Flake*, 814 F.3d 804 (6th Cir. 2016), is distinguishable. In *McDonald*, the plaintiffs were attacked by a group of officers who had "congregated in the . . . precinct parking lot" to drink beer and hard liquor, a regular event known as "Choir Practice" that "was not only commonplace at th[at] precinct, but had been occurring for decades at precincts throughout the city." *Id.* at 809. Socializing with other officers in the privacy of one's home while off duty is a far cry from city-sanctioned gatherings in precinct parking lots.

Gough similarly overreaches with his assertion that "Metro knew that Carthan was on a drunken tear *the day of Gough's shooting* and did nothing to intervene." (D.N. 87, PageID # 544) Approximately twelve hours before the shooting, the LMPD Professional Standards Unit received a complaint by telephone that Carthan had acted aggressively during a traffic stop of Michael Sheckles. (D.N. 87-1, PageID # 685) The sum of Sheckles's complaint was as follows:

> Mr. Sheckles stated Officer Carthan ran up to his vehicle with [h]is gun drawn and put it in his face without identifying himself as a police officer. Mr. Sheckles further stated Officer Carthan used his cell phone to call for another officer with a drug dog to come to his location. He said Officer Carthan searched his vehicle without consent. Mr. Sheckles also stated Officer Carthan cursed at him an[d] belittled him during the entire encounter. After Mr. Sheckles['s] vehicle was searched he and his passenger were released without being charged with any offense.

(*Id.*) The complaint form noted that "Mr. Sheckles stated he would file a formal complaint" the following day. (*Id.*) Louisville Metro maintains that it was awaiting Sheckles's formal complaint before taking action in accordance with Ky. Rev. Stat. § 15.520.[7] (D.N. 90, PageID # 869)

Although a connection between Gough's shooting and the Sheckles incident may seem obvious in retrospect, the latter was not so extreme that it warranted an immediate response. Sheckles did not indicate in his complaint that Carthan might have been intoxicated during the encounter; only when Sheckles was interviewed as part of the investigation following Gough's shooting did he state that Carthan had "appeared to be on somethin[g]." (D.N. 87-1, PageID # 678 (Oct. 15, 2012 statement)) And at least one other officer was present for part of Carthan's interaction with Sheckles; presumably, if Carthan had been impaired, his fellow officer would have reported it. In short, Gough has not demonstrated that Louisville Metro's failure to immediately investigate Sheckles's complaint amounts to negligent supervision.

Gough appears to have abandoned his claim of negligent hiring, which is not addressed in his response to the motions for summary judgment. "[T]he applicable standard for municipal liability" on negligent-hiring claims "is deliberate indifference." *Fox v. DeSoto*, 489 F.3d 227, 238 (6th Cir. 2007) (citing *Canton*, 489 U.S. at 389. This is a high bar:

---

[7] Sheckles never made a formal complaint because he saw the Gough incident on the news and assumed that Carthan would "be fired anyway." (D.N. 87-1, PageID # 683)

> Only where adequate scrutiny of an applicant's background would lead a
> reasonable policymaker to conclude that the plainly obvious consequence of the
> decision to hire the applicant would be the deprivation of a third party's federally
> protected right can the official's failure to scrutinize the applicant's background
> constitute deliberate indifference.

*Id.* (internal quotation marks omitted) (quoting *Bd. of Cty. Comm'rs v. Brown*, 520 U.S. 397, 411

(1997)).  There is no evidence that Louisville Metro failed to adequately scrutinize Carthan's

background or that any red flags were apparent when it hired him.  Summary judgment is

therefore warranted on this claim.

Gough asserts that "Louisville Metro may be held liable for Fourteenth Amendment

violations under a state-created danger theory."  (D.N. 87, PageID # 542)  As Louisville Metro

points out, however, Gough made no such claim in his complaint.  (*See* D.N. 90, PageID # 871;

D.N. 1, PageID # 5-7)  A plaintiff may not raise a new claim or theory of recovery in response to

a summary-judgment motion.  *See Bridgeport Music, Inc. v. WB Music Corp.*, 508 F.3d 394, 400

(6th Cir. 2007); *Tucker v. Union of Needletrades, Indus., & Textile Emps.*, 407 F.3d 784, 788

(6th Cir. 2005).  In any event, the state-created danger doctrine is inapplicable here for the reason

previously stated: Gough's injury was caused by a state actor, not a private person.  *See Estate of*

*Barnwell*, 2017 U.S. App. LEXIS 3905, at *18; *Peete*, 486 F.3d at 223.

Finally, to the extent Gough asserts any state-law claims against Louisville Metro, those

claims are barred by sovereign immunity—a point not disputed by Gough in his response or

during oral argument.  *See* Ky. Rev. Stat. § 67C.101(2)(e); *Jewish Hosp. Healthcare Servs., Inc.*

*v. Louisville/Jefferson Cty. Metro Gov't*, 270 S.W.3d 904, 907 (Ky. Ct. App. 2008).

## III.    CONCLUSION

For the reasons set forth above, and the Court being otherwise sufficiently advised, it is

hereby

**ORDERED** as follows:

(1)     Carthan's motion for summary judgment (D.N. 70) is **GRANTED** as to Gough's claims of negligence, intentional infliction of emotional distress, and state-created danger.  The motion is **DENIED** in all other respects.

(2)     Louisville Metro's motion for summary judgment (D.N. 72) is **GRANTED**.

May 23, 2017

**David J. Hale, Judge**
**United States District Court**